UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA,

v.  Case No: 8:24-cr-113-KKM-AAS

RAYSHEIO BLACK,

    Defendant.
_____

## ORDER

Officers discovered a firearm in a vehicle operated by Raysheio Black after a warrantless traffic stop and search of the vehicle. Based on evidence derived from that stop, a grand jury indicted Black for committing a Hobbs Act robbery, using a firearm during that robbery, and possessing a firearm as a felon. *See* Superseding Indictment (Doc. 43). Black moves to suppress (1) "all items," including the firearm, seized from the vehicle after the warrantless search; (2) any statements he made to law enforcement officers after he was taken into custody; and (3) any item seized from the same vehicle after law enforcement searched it pursuant to a warrant. Mot. to Suppress (MTS) (Doc. 52); Reply (Doc. 66); Suppl. Mot. to Suppress (Suppl. MTS) (Doc. 90). The government argues that the search was constitutional because

the automobile and inventory exceptions to the Fourth Amendment's warrant requirement apply. Black counters that the initial traffic stop was unlawful and none of the exceptions apply.[1] After holding an evidentiary hearing, I deny Black's motions.

## I. BACKGROUND

In February 2024, Joshua Dorofy, a detective with the Lakeland Police Department, learned that a vehicle was traveling toward Lakeland that matched the description of a vehicle used in a recent robbery. Hearing Transcript I (Doc. 103) at 68:3–23. Dorofy notified Preston Chatmon, an officer with the Lakeland Police Department, and provided Chatmon with the tag number and vehicle description. *Id.* at 57:5–7, 68:8–10. Dorofy asked Chatmon to locate the vehicle and develop probable cause for a traffic stop. *Id.* at 7:23–8:3, 9:2–6, 68:8–10, 71:9–17. So Chatmon positioned his vehicle on Memorial Boulevard in Lakeland and began looking for the vehicle. *Id.* at 9:15–19.

After watching the vehicle pass by, Chatmon followed behind. Less than two minutes later, Chatmon observed that the vehicle's driver, Raysheio Black, did not

---

[1] Black, relying on *Rodriguez v. United States*, 575 U.S. 348 (2015), originally argued that suppression was warranted based on the length of time between the traffic stop and the dog sniff, but he dropped this argument after receiving more discovery. Reply at 1–2.

2

have a seatbelt crossed over his left shoulder. *Id.* at 10:7–9, 10:18–20, 21:20–25, 22:15–24. On that basis, Chatmon effectuated a traffic stop. *Id.* at 10:7–13, 10:23–11:25; Chatmon's Dash Camera Footage (Dash Cam.) (Govt.'s Ex. A) at 0:30–1:20; *see* § 316.614(4)(b), Fla. Stat. ("It is unlawful for any person . . . [t]o operate a motor vehicle or an autocycle in this state unless the person is restrained by a safety belt."). Chatmon is "certain that [he] didn't see the shoulder strap that a normal prudent person would be wearing . . . in a correct manner." Hearing Transcript I at 59:21–25. Chatmon's vision, he testified, was unimpaired by the tint on Black's rear window and was assisted by his 15 years of "training and experience" which "taught [him] what to look for." *Id.* at 22:21–24.

Two videos document Chatmon's initiation of the stop and the events that took place immediately thereafter. The first—taken from a dashcam—is not helpful. Given the glare, the angle, and the tint on Black's rear window, it is impossible from the video to discern whether Black is wearing a seat belt. Dash Cam. at 0:00–0:45. Chatmon testified, though, that he could "see a lot better" than his camera could. Hearing Transcript I at 21:2–14. In the second video—taken from Chatmon's body cam—Chatmon indicates on at least three occasions that he had trouble seeing through Black's windows. *See* Chatmon's Body Camera Footage (Body Cam.)

3

(Govt.'s Ex. B) at 3:08–3:11 ("Can you let down all four windows? I can barely see in there."); *id.* at 6:40–57 (Chatmon explaining that he stopped Black because: (1) "[he] did not see a seatbelt" and (2) "[he] can't see in those windows"); *id.* at 9:08–09 ("I can't even see through those windows."). Chatmon also twice asked Black whether there were other passengers in the car (which Black takes to suggest that Chatmon could not see inside). *Id.* at 3:42–48, 5:27–28.

When asked about the body cam footage during the evidentiary hearing, Chatmon testified that he had difficulty seeing only once he exited his vehicle and that his difficulty pertained to Black's side windows rather than the rear window. Hearing Transcript I at 22:15–24:10, 30:10–13, 31:14–32:14; *see* Body Cam. at 2:40–3:10. Chatmon testified that it "was much easier [to see] prior" to the traffic stop because "everything was a lot calmer" and Black was unaware that he was about to be pulled over. Hearing Transcript I at 51:16–52:3.

Once stopped, Black informed Chatmon that he did not have a valid driver's license. Body Cam. at 5:40–50. Chatmon's subsequent search of the Driver and Vehicle Information Database confirmed this to be true. *Id.* at 13:25–14:26; Hearing Transcript I at 34:10–20. By this time, Detective Dorofy had arrived on the scene. After learning that Black operated a vehicle without a valid license, a misdemeanor

4

in Florida, Dorofy decided to arrest Black. Hearing Transcript I at 72:4–22, 73:1–18; Arrest Aff. (Doc. 55-2); *see* § 322.03(1), Fla. Stat.

After Black's arrest, Sergeant Sean Finney arrived accompanied by Dean, Finney's police dog. Dean is "a 2-year-old, single purpose certified, Labrador Retriever police service dog," who is "certified through the United Stated Police Canine Association (USPCA) in Drug Detection." (Doc. 66-1) at 34. Dean "completed his drug detection [training] [on] August 2, 2023," and is "trained and certified to detect the odors of Cocaine, Methamphetamine, Heroin, and Marijuana." *Id.*; *see* (Doc. 70-2) (USPCA certificate of certification for Finney and Dean); Hearing Transcript II (Doc. 106) at 7:8–9:5.

Dean proceeded to sniff the vehicle. Body Cam. at 36:26–41:00; Dash Cam. at 35:19–39:57. As Dean was sniffing, Finney testified that a nearby source of marijuana distracted Dean several times. Hearing Transcript II at 15:24–16:7, 17:23–18:14, 33:2–34:14, 34:25–36:3. After one pass around the vehicle, Finney instructed Dean to do a second pass "detailing seams." (Doc. 66-1) at 34; *see* Hearing Transcript II at 17:5–20, 19:3–14, 40:6–17. When Dean "got to the driver's side door he exhibited a clear behavior change as he sniffed the driver's side door seam and then had a behavior change when he sniffed inside the open driver's

5

window." (Doc. 66-1) at 34; *see* Dash Cam. at 37:23–39:57; Body Cam. at 38:33–41:00. The relevant behavioral changes, Finney testified, include a slowing of the tail, closing of the mouth, a change in breathing patterns, and an upward point of his head and nose. Hearing Transcript II at 21:20–23:3, 43:20–44:4. Finney interpreted these changes as alerting to a drug odor originating from the car. *Id.* at 22:8–13, 25:25–26:5, 58:11–19. Dean, though, never gave a final response because he did not find the source of the odor. *Id.* at 23:21–24:2.

After Finney notified the lead detective of Dean's positive alert, officers began to search the vehicle. *See, e.g.*, Dash Cam. at 40:12–42:00. As the officers searched, Chatmon's dashcam picks up a conversation between Chatmon and Finney. In the conversation, Finney notes that there was a source of marijuana odor near the vehicle that distracted Dean, and that Dean is "not a good street level dog yet." *Id.* at 41:10–46, 42:01–42:03. Finney also says, though, that Dean went into "high alert" as he went through the driver's side window. *Id.* at 41:15–19.

After searching, officers did not find illegal narcotics in the vehicle. (Doc. 66-1) at 35. In the trunk, officers found a backpack, which contained a Taurus, model G2c, 9-millimeter pistol. Body Cam. at 47:26–40; Arrest Aff. at 3. After receiving

6

his *Miranda* warnings, Black confessed to owning the gun and admitted that, as a convicted felon, he should not have possessed it. Arrest Aff. at 3.

A few weeks after the stop, Black states that officers obtained a federal search warrant for the vehicle and, upon execution, seized a single 20-gauge shotgun cartridge. MTS at 7.[2]

A federal grand jury indicted Black on one count of possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1) and 18 U.S.C. § 924(a)(8). Indictment (Doc. 23). Following further investigation, a federal grand jury returned a superseding indictment charging Black with one count of Hobbs Act robbery, in violation of 18 U.S.C. § 1951(a) and (b) and 18 U.S.C. § 2; one count of use of a firearm during the commission of a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(ii) and 18 U.S.C. § 2; and one count of possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1) and 18 U.S.C. § 924(a)(8). Superseding Indictment. Burke now moves to suppress. *See generally* MTS; Reply; Suppl. MTS.

---

[2] Black provides no independent argument as to the lawfulness of this search. He moves to suppress because "the affidavit supporting the requested warrant relies on the evidence seized without warrant from the traffic stop." Reply at 2 n.2.

## II. LEGAL STANDARDS

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause." U.S. CONST. amend. IV.

To initiate a traffic stop in compliance with the Fourth Amendment, a law enforcement officer must have "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Navarette v. California*, 572 U.S. 393, 396 (2014) (quoting *United States v. Cortez,* 449 U.S. 411, 417–18 (1981)); *accord United States v. Campbell*, 26 F.4th 860, 880 (11th Cir. 2022) (en banc) (explaining that, "to comply with the Fourth Amendment," an officer initiating a traffic stop "must have reasonable suspicion").

"Where a search is undertaken by law enforcement officials to discover evidence of criminal wrongdoing, [the Supreme Court] has said that reasonableness generally requires the obtaining of a judicial warrant." *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 653 (1995). The automobile exception "allows law enforcement to conduct a warrantless search of a vehicle if (1) the vehicle is readily

8

mobile and (2) law enforcement has probable cause to search it." *United States v. Morley*, 99 F.4th 1328, 1336–37 (11th Cir. 2024).

The defendant ordinarily has the burden in a suppression hearing, but when "a defendant produces evidence that he was arrested or subjected to a search without a warrant, the burden shifts to the government to justify the warrantless arrest or search." *United States v. de la Fuente*, 548 F.2d 528, 533 (5th Cir. 1977).[3] "[T]he controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence." *United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974).

## III. ANALYSIS

Black argues that both the traffic stop and the subsequent search of his vehicle violated the Fourth Amendment. I disagree.

### A. Reasonable Suspicion Justified the Traffic Stop

Black argues that the record does not support Chatmon's testimony that he could see inside Black's car and discern that Black was not wearing a seatbelt. Suppl. MTS at 8. As a result, Black contends that the traffic stop was without reasonable

---

[3] In *Bonner v. City of Prichard*, the Eleventh Circuit adopted as binding precedent all decisions rendered by the United States Court of Appeals for the Fifth Circuit prior to the close of business on September 30, 1981. 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

9

suspicion and violated the Fourth Amendment. *Id.* The government responds that the record does not contradict Chatmon's testimony, which itself provides probable cause for the traffic stop. Resp. to Suppl. MTS (Doc. 93) at 2–4.

The reasonable suspicion standard—which considers "the totality of the circumstances," *Cortez*, 449 U.S. at 417—is a low bar. Although not satisfied by a "mere hunch," the "reasonable suspicion" necessary to justify a stop is "considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." *Navarette*, 572 U.S. at 397 (quotations omitted). The government has met that low bar.

Chatmon repeatedly testified that, as he was driving behind Black, he did not see a seatbelt crossing over Black's left shoulder. Hearing Transcript I at 10:7–13, 19:12–14, 20:9–19, 21:20–25, 22:15–24, 57:24–58:5. Indeed, Chatmon was "certain" that he did not see a shoulder strap "that a normal prudent person would be wearing . . . in a correct manner." *Id.* at 59:21–25. I find this testimony credible. And "viewed from the standpoint of an objectively reasonable police officer," observing an individual operate a vehicle without a seat belt "amount[s] to reasonable suspicion" that the driver is violating Florida traffic law. *Ornelas v. United States*, 517 U.S. 690, 696 (1996).

10

For two reasons, Black argues that this testimony does not establish reasonable suspicion. First, Black argues that Chatmon's dashcam footage reveals that Chatmon could not have possibly seen inside Black's car. Suppl. MTS at 5–6, 8. Black's argument is not without some force, as the footage provides no view into Black's vehicle and therefore does not corroborate Chatmon's testimony. At the same time, the footage does not render uncredible Chatmon's testimony. And the footage certainly does not show Black wearing his seatbelt when Chatmon pulled him over. *Cf. United States v. Meeks*, No. 22-14145, 2023 WL 6120615, at *3 (11th Cir. Sept. 19, 2023) (per curiam) (concluding that an officer lacked reasonable suspicion when the district court found that the defendant was wearing his seat belt and "there was no discussion at the suppression hearing about how [the officer's] misidentification could have constituted an objectively reasonable mistake under these circumstances").

Also, Chatmon testified that the footage is not a "faithful representation" of what he was able to see in the vehicle. Hearing Transcript I at 21:2–14. Instead, because the sunlight affected the dashcam footage's accuracy, Chatmon explained that he was able to "see a lot better than [his] camera could see." *Id.* at 21:6–14. This testimony comports with common experience that the lighting and angle of a video

11

does not always match an individual's vision in real time. In the light of the above, I conclude that the dashcam footage does not undermine Chatmon's credibility. *Cf. United States v. Chanthasouxat*, 342 F.3d 1271, 1276 (11th Cir. 2003) ("Great deference is given to the judgment of trained law enforcement officers on the scene." (quotation omitted)).

    Second, Black relies on Chatmon's statements after he effectuated the traffic stop. Three times, Chatmon indicated that he had trouble seeing through Black's windows. Body Cam. at 3:08–3:11, 6:40–57, 9:08–09. Twice, Chatmon asked Black whether there were other passengers in the car, which Black takes to suggest that Chatmon could not see inside. *Id.* at 3:42–48, 5:27–28. But Chatmon explained that his statements at the scene were based on his view from a different vantage point—standing outside his vehicle and looking into Black's side windows—and he could see better when he was driving behind Black before the escalation of the traffic stop. Hearing Transcript I at 22:15–24:10, 30:10–13, 31:14–32:14, 51:16–52:3. Based on my assessment of Chatmon's credibility, his statements at the scene do not undermine the veracity of his testimony.

    In sum, I conclude that Chatmon had "a particularized and objective basis for suspecting [Black] of" violating Florida law. *Navarette*, 572 U.S. at 396 (quoting

*Cortez*, 449 U.S. at 417). Accordingly, the traffic stop was a reasonable seizure under the Fourth Amendment. *See Campbell*, 26 F.4th at 880.

### B. The Automobile Exception to the Warrant Requirement Applies

The government argues that the warrantless search of Black's vehicle is reasonable under the automobile exception. Resp. (Doc. 70) at 7–11.[4] For the automobile exception to apply, the government must demonstrate that: (1) the vehicle is readily mobile and (2) probable cause exists to search it. *Morley*, 99 F.4th at 1336–37. The first element is not in dispute. Ready mobility is "*inherent* in all automobiles that reasonably appear to be capable of functioning," *United States v. Nixon*, 918 F.2d 895, 903 (11th Cir. 1990) (emphasis in the original), and Black "drove the car to the scene," *Morley*, 99 F.4th at 1337. Instead, Black argues that the canine sniff in this case does not provide the necessary probable cause. Reply at 2–7. I disagree.

"A drug detection dog's alert can provide probable cause to conduct a search." *United States v. Braddy*, 11 F.4th 1298, 1312 (11th Cir. 2021). In assessing whether a canine's alert is sufficient to supply probable cause, the Supreme Court has rejected

---

[4] The government also raises an argument under the inventory exception. Resp. at 3–7. I do not need to consider this argument in the light of my conclusion that the automobile exception applies.

13

a "strict evidentiary checklist" in favor of the "totality-of-the-circumstances analysis" that normally governs probable-cause determinations. *Florida v. Harris*, 568 U.S. 237, 244–45 (2013). The question in this case, as in any other that considers whether an officer had probable cause to search, is whether the facts available to the officer "would warrant a person of reasonable caution in the belief that contraband or evidence of a crime is present." *Id.* at 243 (cleaned up).

In testing the reliability of a canine sniff, the Supreme Court in *Harris* explained that "records of a dog's performance in standard training and certification settings" are ordinarily more informative than "records of a dog's field performance." *Id.* at 245–46. For example, field performance records "may not capture a dog's false negatives" because if "a dog on patrol fails to alert to a car containing drugs, the mistake usually will go undetected because the officer will not initiate a search." *Id.* at 245. Conversely, if "the dog alerts to a car in which the officer finds no narcotics, the dog may not have made a mistake at all," as the "dog may have detected substances that were too well hidden or present in quantities too small for the officer to locate," or "the dog may have smelled the residual odor of drugs previously in the vehicle or on the driver's person." *Id.* at 245–46. These inaccuracies, the Court explained, "do not taint records of a dog's performance in standard training and

14

certification settings." *Id.* at 246. It is for this reason that "evidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert." *Id.*; *see id.* at 246–47 ("If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search."); *United States v. Sentovich*, 677 F.2d 834, 838 n.8 (11th Cir. 1982) (endorsing the view of "[t]wo other circuits [that] have held that training of a dog alone is sufficient proof of reliability").

"A defendant . . . must have an opportunity to challenge such evidence of a dog's reliability, whether by cross-examining the testifying officer or by introducing his own fact or expert witnesses." *Harris*, 568 U.S. at 247. A defendant may challenge evidence of a dog's reliability by, among other things, contesting the adequacy of the certification, examining how the dog (or handler) performed in the certification or training program, or offering evidence in support of the proposition that that the "circumstances surrounding a particular alert" undercut the probable cause determination. *Id.*

Returning to this case, Finney and Dean received a "narcotics detection dog certification" from the United States Police Canine Association. (Doc. 70-2) at 1.

15

Finney testified to the certification process, as well as his training with Dean, and the certifications—which then covered the odors of cocaine, methamphetamine, heroin, and marijuana—were active at the time of the search of Black's vehicle. *See* Hearing Transcript II at 3:23–4:4, 4:22–9:5. Finney's testimony and the pair's active certification weighs in favor of a reliability finding. *See Harris*, 568 U.S. at 246–47; *Braddy*, 11 F.4th at 1312–13.

The government also relies on Finney's "trained interpretation of Dean's subtle behavior changes." Resp. at 10; *see generally* (Doc. 66-1) (documenting Finney's deployments with Dean). Finney testified in detail to the canine sniff of Black's vehicle and explained why he interpreted Dean's behavior—the slowing of his tail, the lift of his head and upward point of his nose, the close of his mouth, and the changes in his breathing—to indicate the presence of a drug odor originating from the vehicle. *See* Hearing Transcript II at 21:19–23:3, 43:22–44:4, 58:20–59:21. Based on Dean's response, Finney had "no doubt that [Dean] was in odor that he was trained to find." *Id.* at 25:25–26:5, 58:11–19. Given Finney's "close proximity at the scene" and his "history of extensive training and familiarity" with Dean, I find his testimony credible and supportive of a probable cause finding. *Braddy*, 11 F.4th at 1314; *see, e.g., id. at* 1313–14 ("[I]t was the province of the district court to

16

observe and assess the officers' testimonies on their drug detection dogs' behaviors and to determine whether to credit their testimonies.").

Black offers two arguments in support of the proposition that Dean's alert was unreliable. First, citing Dean's limited deployment history, Black argues that Dean's "successful detection of narcotics is always preceded with a final response, namely sitting down." Reply at 4; *see* (Doc. 66-1) at 4, 6, 12, 31. Here, "[i]n sharp contrast," Dean did not provide a "final response" before the officers searched the vehicle. Reply at 4. Given *Harris*'s rejection of a "strict evidentiary checklist," 568 U.S. at 244, the Eleventh Circuit, along with other circuits, has rejected a "rule requiring a final response, indication, or alert for a drug dog to be sufficiently reliable," *Braddy*, 11 F.4th at 1314–15; *see, e.g.*, *United States v. Parada*, 577 F.3d 1275, 1282 (10th Cir. 2009) ("We decline to adopt the stricter rule urged by Mr. Parada, which would require the dog to give a final indication before probable cause is established."); *United States v. Thomas*, 726 F.3d 1086, 1098 (9th Cir. 2013). These decisions follow from the fact that probable cause "is a doctrine of reasonable probability and not certainty." *United States v. Magluta*, 44 F.3d 1530, 1535 (11th Cir. 1995). Black is therefore incorrect to argue that the lack of final response is dispositive as to Dean's reliability. Also, Finney persuasively explained at the evidentiary hearing why the

17

lack of a final response did not detract from his observations of Dean's behavior. *See* Hearing Transcript II at 23:21–24:25. The lack of a final response, Finney testified, is owed to Dean not finding the source of the odor; it does not indicate a lack of proximity to an odor. *See id.* at 12:9–13:21.

Black also relies on Finney's statements at the scene about Dean's reliability and the presence of marijuana odor originating from a nearby residence. *See* Reply at 5–6. According to Chatmon's dashcam footage, Finney stated that Dean was distracted by this nearby source and that Dean was "not a good street level dog yet." Dash Cam. at 41:10–42:03.[5] At the evidentiary hearing, Finney acknowledged the nearby source of marijuana odor but also explained that he focused Dean on Black's vehicle. Hearing Transcript II at 15:24–16:7, 17:23–18:14, 33:2–34:14, 34:25–36:3, 41:8–42:5. As noted above, when focused on the vehicle, Finney interpreted Dean's behavior as alerting to the presence of a drug odor originating from the vehicle. *See id.* at 25:25–26:5, 58:11–19. As for Dean's ability as a "street level dog," Finney testified that, at the time of the search, Dean was "still [a] young" dog and thus was

---

[5] The dashcam footage also includes Finney telling Black something to the effect of "don't have drugs in the car and . . . I won't search it." Hearing Transcript II at 51:10–11; *see* Reply at 5; Dash Cam. at 40:02–05. I do not find this statement relevant to the probable-cause inquiry.

18

sometimes distracted. *Id.* at 57:10–58:8. But Finney testified that this did not impede Dean's ability to find drugs and that, on the day of the search, he did not have any indication that Dean was "not a good street level dog." *Id.* at 57:19–20, 62:10–15. In the light of this testimony and the other evidence, I do not find Finney's on-scene statements to undercut a probable-cause finding given the other evidence in this case.

In sum, I find Finney's testimony credible and conclude that probable cause existed to search the vehicle. Because the automobile exception applies, the warrantless search of Black's vehicle was reasonable. *See Morley*, 99 F.4th at 1336–37.

## IV. CONCLUSION

Neither the traffic stop nor the search of Black's vehicle violated the Fourth Amendment. Accordingly, Black's Motion to Suppress (Doc. 52) and Black's Supplemental Motion to Suppress (Doc. 90) are **DENIED**.

**ORDERED** in Tampa, Florida, on August 21, 2025.

Kathryn Kimball Mizelle
United States District Judge